1445 Plyler v. Cox. Mr. Robb, please don't hurry, but whenever you're ready and your opposing counsel's ready, we'll be happy to hear from you. May it please the Court, this case highlights the harm that can result when a district court disregards its dalbert gatekeeping obligations to ascertain that expert witness testimony is both relevant and reliable before it is submitted to the jury. The district court in this case expressly refused to make those determinations, instead ruling that it was the jury's job to do so. And as a result, expert testimony was admitted that, among other things, was relied upon by the court in denying the defendant appellant's Rule 50b motion, which testimony should have been excluded. When that improperly admitted expert testimony is disregarded, the evidence at trial did not provide a legally sufficient evidentiary basis for a reasonable jury to find for the plaintiff on last clear chance and on gross negligence. Is that how we do it? Wait, so you want us to hypothesize that you win your dalbert challenge, we then knock out that witness, and then you think we would proceed to ask whether there are case absent that witness? Because it would seem to me, if I was a plaintiff and lost a dalbert motion, I might try to find another expert, as opposed to just be like, well, I guess I don't have an expert now. Well, Your Honor, that's exactly what this court did in Nice and in Sardis. On the appeal, following the denial of a Rule 50b motion, the court first ascertained whether expert witness testimony that had been admitted was properly admitted. And in both cases, the court found no, that that evidence was inadmissible. It should have been rejected. But after that inadmissible evidence was rejected, the court then performed the Rule 50b analysis, excluding that inadmissible expert witness testimony, and determined that the remaining record was insufficient, legally insufficient, for a reasonable jury to find for the plaintiff. And consequently, in both those cases, the court did exactly what we're asking the court to do here, which is to remand the case to the district court for the entry of judgment in favor of the defendant. Well, let's assume that we agree that the judge was right, then talk about why the jury could not come to the conclusion, as it did, that the last clear chance doctrine applied, therefore the plaintiff can recover. Certainly, Your Honor. So the expert witness testimony that we contend was improperly admitted. I'll give you that. Sure. So when you get to last clear chance, the evidence at trial did not support a finding of last clear chance under either of the two theories of that doctrine that are recognized in North Carolina. And what case says that? What I see you cite, you insist the restatement of torts says there are two theories of last clear chance. And you say North Carolina has adopted that. And then I look at the authority that you identify for that proposition. Problem number one, it's a decision of the North Carolina Court of Appeals, which is not the Supreme Court of North Carolina. And two, it doesn't say that. It just cites this provision of the restatement, which is different than saying in North Carolina, there are two and only two theories of last clear chance. So what authority, other than the Court of Appeals' opinion that I do not believe adopts that rule, do you think says that? Well, certainly, Your Honor. So you're referring to the Keenan v. Bass case, which goes through the law of last clear chance in North Carolina and restates both portions of the restatement of tort. We've also got the Cagle opinion of this Court, which looked at the question of last clear chance in North Carolina and also evaluated the portions of the restatement of torts that you've got the helpless plaintiff theory of last clear chance. So what you're saying is that the highest expositor of North Carolina law has said, these are the two and only two versions of last clear chance that exist in North Carolina. Well, Your Honor, what the highest version of North Carolina, and Your Honor, the specific name of the case escapes me at the moment, but it's cited right at the beginning of the discussion of last clear chance in our opening brief. North Carolina Supreme Court case. And what the Court said was that when you look at last clear chance, it's very factually specific, but you need to look at the specific facts. And the Court goes through the analysis of both 479 and 480 of the restatement second of torts. Can I just start with a premise? Judge Whitney is a very good judge, and so you make some interesting arguments on appeal. One of the challenges I've got is that I don't see any of those being made below. None of this discussion goes on. It doesn't appear to me that you object to the jury instruction on last clear chance. And when I look at the, like, half-hearted arguments that are made below, they're just conclusory, right? So you've got a trial brief that has a paragraph that says you just can't possibly find this, right? At the conclusion of evidence at J1628, you say there's just no evidence of last clear chance, which is a great conclusion but doesn't give Judge Whitney much to work with. And then after the trial at 1872, you just say the same thing, right? Am I missing, like, where you put the district judge on notice that it needed to do something beyond the jury, right? Because when I read the arguments that you made below, Judge Whitney's decision seems like not just reasonable but, like, patently correct. When I read your argument, to your great credit, on appeal, you make some fairly persuasive arguments, but it feels an awful lot like a sandbag where you're asking us to reverse Judge Whitney when you accepted the jury instructions as they were and made no effort to sort of, like, distinguish these two ideas or, you know, go down the road of explaining when he was in peril, what moment that existed, what was supposed to happen. Like, none of that was given to Judge Whitney. It's all given to us now, like, quite well done. You know, kudos to you for writing a good brief. But what am I supposed to do with that when I've got a district court judge who's, like, you know, doing an excellent job across the board? You make some sort of passing reference to the last clear chance doctrine and then now expect us to, like, trace through the, like, various strands of the restatement that you don't raise or address and cases that you don't cite? What am I supposed to do with that? Well, Your Honor, I disagree with the statement that this was not raised at trial. In the context of the trial, the discussion was focused on whether or not Mr. Pyle was in a position of helpless peril and whether or not the defendants had the last clear chance to prevent his injury. And so at the trial court briefing, at the trial court argument on the Rule 50A motion, the focus was principally on whether or not the defendants ever had a last clear chance to prevent Mr. Plyler's injury. And we pointed to the evidence that did not support that argument, the fact that at the time that Mr. Plyler was hurt, nobody else was anywhere near him, that Mr. Plyler is the one who opened the sliding steel door and there was no evidence that anybody else in the bin was aware that he had done so. And we did object to the trial court submitting the issue of last clear chance to the jury. And so the issue was not so much with the way that the jury instruction was couched, but with the submission of that issue to the jury in the first instance. You never asked the trial judge to tell the jury in North Carolina there are two and only two theories of last clear chance because the Restatement of Torts says that, right? That's correct, Your Honor, because to – So you have to – and that – you never asked the trial judge to tell the jury, in order to find last clear chance, you have to make the findings in this provision of the Restatement or these findings in this provision of the Restatement. You never told the trial judge he should tell the jury that. No, Your Honor, but with respect, there was no reason to do that because the plaintiffs at the time were arguing helplessness. They were not arguing in attention. They were not conceding. Mr. Plyler obviously wasn't paying attention to what he was doing, but you can find last clear chance anyway. They were focused on helplessness, and so our response was to helplessness. But when, in the 50B briefing, the plaintiffs began to argue in attention, at that point in our reply brief, we raised the issue with the judge and articulated the distinction between helpless plaintiff and inattentive plaintiff. And so Judge Whitney had all that information in front of him when he ruled on the Rule 50B motion. And respectfully, Your Honor, the standard for your consideration of this Rule 50B motion is de novo. You're looking at whether or not Judge Whitney made a decision that was legally correct as a matter of law. No, no. Our standard is de novo for arguments that were properly preserved in the district court, right? Our standard is not de novo for arguments that were forfeited in the district court. And that's always the case, Your Honor, and I do believe that we properly preserve this here where when the plaintiffs raise the issue of inattention really for the first time. If you look at the trial record, nobody was arguing Mr. Pliable was admittedly inattentive, but we can recover on last clear chance anyway. That was raised in the post-trial briefing, and it was responded to appropriately in the post-trial briefing at that time. Do you think you can, like, do that? I don't have the post-trial briefing before me, but when I look at all the arguments that you made in the pretrial brief after the close of the plaintiff's case and at the end of the trial, none of those seem to make those arguments. Like, can you then show back up? I mean, it feels to me like you've sandbagged the district judge. I don't mean that as a critique. I'm just saying, like, these are very superficial arguments that are being made to Judge Whitney during the trial, and then you come up here and you give us all of these cases and things that you didn't give to the district court judge. That just feels to me like you've forfeited the nuance, right, that what we ought to be doing is saying, like, the arguments that you've actually made are the ones that are in the briefing and in the hearings, and to the extent you've got new arguments about theories of this doctrine or cases that sort of articulate when peril attaches, right, which is totally a fascinating set of your brief, right? I thought you did an excellent job of articulating it, right? But when I look at the briefing in the district court, like, there's no discussion about when peril attaches. In fact, that's why the jury asked the question, for goodness sakes, how are we supposed to know when peril attaches, right? Is it when the grain bin is built? Is it when he's called? Or is it when he enters the bin? I mean, none of those issues had been addressed by you or by the plaintiff, frankly, but they got an instruction. They'd make the best decision. It's hard for me to, like, critique Judge Whitney, even though I think you've got some really good arguments on appeal. Your Honor, I think you made the key point there, or by the plaintiff. We raised legitimate objections, objections that still hold and that if Your Honor merely considered the question of whether anybody else in the bin had the opportunity to prevent his injury, we should still prevail. But we responded when other arguments were raised in an appropriate fashion. I don't think it was incumbent on us to raise every single possible reason why Judge Whitney should not have given the last-chance instruction. You don't have to raise every reason. But if you don't raise a reason, you can't raise it now. Well, we did raise it. That's the rub. In the post-trial briefing, we raised all the arguments that are raised now. They were raised to the district court before the court entered the order that we've appealed from. We raised them at a time when they were responsive to arguments that the plaintiffs had asserted. And so I contend, Your Honor, that we have properly preserved, but more to the point. Can you just make sure I understand, is this 1872? Is that where you, where, JA 1872? Where is the briefing that you think has raised all the arguments that are in your brief? It was the reply brief that was filed in support of our Rule 50B motion and motion for a new trial. It was filed approximately January 16th of 2024. I don't know the joint appendix reference. January of 2024? Or January of 2025? It was filed in January of 2024, Your Honor. Our trial was in November of 23, and we had our post-trial briefing in December and January. So it was filed in January. That reply brief went in great detail into the last clear chance arguments that we've asserted here, and I believe that it was appropriate to do so at that time because it was responsive to arguments the plaintiffs made. What you want to say, because when I read the actual motion that you made, about the extent of the argument is there is no legally sufficient evidentiary basis from which a reasonable jury could have found last clear chance. That's it. I mean, I just quoted the whole argument that you made on last clear chance in the opening brief, and your position is that you didn't raise it in the initial brief, you didn't raise it before the trial court in argument before that, but in the reply to the Rule 50B motion that that's how you preserved all these arguments? Like that's where you want me to look to say that you've preserved all the arguments about when peril attacks and the like. I do think that that's an appropriate place to preserve the arguments because they were responsive to specific arguments that the plaintiffs raised to counter our brief, to counter our motion. Well, can I ask you about another response point? Yes, Your Honor. So in your opening brief before us, you say that the owners of this business can't be held liable because they weren't there. And then in their response brief to your opening brief, they quote cases for the seemingly uncontestable proposition of if you are a general partner in a partnership, you are liable if the partnership is liable. And then I notice in your reply brief you don't mention the two owners of the business. Do you have any response to the argument that if the business is liable, the owners – I understand there's two people who aren't owners. I want to bracket the people who aren't owners. But in response to the argument that they make in their response brief that you conspicuously do not respond to in your reply brief, if the business is liable, the general partners are also liable. It doesn't matter if they were there or not. What part of being a general partner do you not understand? Well, Your Honor, I do understand what it means to be a general partner. And they would be liable as general partners. But that argument was raised in the context of last clear chance, the question of whether they personally were present such that they individually had the last clear chance to prevent Mr. Plowell's injury. And there's no evidence to support that, Your Honor. So, no, we're not intending – Okay. But let me get their theory. Their theory is that if an agent of the business was there and had a chance, then the business is liable under respondeat superior. And once the business is liable, the owners of the business are personally liable because that is one of the most essential characteristics of being a general partner. Right. And I don't disagree with that, Your Honor. But the argument was made in the context of whether or not these individual owners had the last clear chance to prevent Mr. Plowell's injury. That argument was not really responsive to that issue. So I don't disagree with what you just said. Okay. I believe that's a correct statement of the law, but they weren't physically present. They didn't have the last clear chance. I seem to be almost out of time. I just want to briefly address the cross appeal. This is addressed, I think, extensively in the briefs, but I just want to make two points. First, the plaintiff's argument about what the standard should be is really an ought law argument. They're not arguing as to what North Carolina law is. They're arguing as to what North Carolina really ought to be because the plaintiff's rule is completely inconsistent with the court of appeals decisions from the 1980s in Asselino and Paris and Schenck. Finally, the plaintiff's argument comes from, I see that I'm out of time, Your Honor. May I finish my statement? You can finish this thought. Yeah. The plaintiff's argument really relies on the Searley case. The Searley case is an unpublished court of appeals opinion which is not authoritative in the State of North Carolina as an unpublished opinion. And moreover, as the plaintiffs themselves raise in a footnote in their reply brief, when two lines of authority at the court of appeals disagree, you go with the older one. Well, the older line of authority is what we have cited from the 1980s as opposed to the Searley case which is from 2005. Thank you, Your Honor. Happy to hear from you, Counsel. Good morning, Your Honors, and may it please the Court. Alex Haroi on behalf of the plaintiff, appellees and cross appellants Robbie and Debbie Plyler who are also here in the courtroom on the first row behind me. Thank you for hearing us today. This case is about the plaintiff's, the appellant's attempt to say that Judge Whitney got all this wrong and the jury got it wrong. When we have a unique circumstance that we know the jury was specifically attuned to the issues on which they appeal. They were attuned to the issues of when is the last clear chance attached? Do the facts support last clear chance? And so I think that's, it's a high burden, not only on our procedural history but on the facts of this case. I'll turn also to Judge Hytens, your question about where does it say North Carolina observes this dichotomy of inattentive plaintiff versus helpless plaintiff. I don't believe that's the law. I believe that the North Carolina Supreme Court in the Exum case from I think it's 1958 approximately does cite the restatements. But they say our law is this and goes through the elements which Judge Whitney properly gave in the jury instructions to the jury based on those factors which the appellants agreed to the form of those jury instructions and says these are the elements of North Carolina law. It's also in accord with the restatement and says that it supports it too. And here's the different theories that are just advanced nationally. It even goes back to a case in England called the Fetterdass case and says this is where it goes through. So it's a historical context of where that comes into play and it supports the last clear chance. So I think the case is the law was correctly submitted to the jury. The jury focused on it and got it right. If we're going to go into this sort of hyper technical when does the peril attach, I think it's very clear that the jury could reasonably find that the appellants were negligent when they cut the bar out, when they didn't provide training, when they didn't tell people. And then Mr. Plyler was negligent when he opened the doors all the way. And that was certainly a theory below. So what I know I guess from the jury, what I know from the verdict form, is that the jury found that the plaintiff was contributory negligent in at least some way. We know that. So what you're telling us though is I don't know from the verdict form what exactly that jury found he did that was contributory negligent. Correct. And so you're, in order to, I meant to ask the other side this, but just when we say last clear chance, am I right in thinking what that really means is that after the plaintiff's negligence was over, there was an opportunity for the defendant to prevent it from happening? No, no. Or around the same, go ahead. No, the Exum case for the North Carolina Supreme Court specifically disavows the logic that it has to be a subsequent act of negligence by the defendant, subsequent to the plaintiff's act of contributory negligence. Because they could be simultaneous? Or the plaintiff's negligence can be ongoing, as this court observed in the Cagle versus Baltimore Railroad case, where the man's on the tractor and the train's bearing down on him. Sorry, I mean simultaneous, yes. Simultaneous in the sense of the plaintiff is doing a course of conduct that is just negligent. Correct. And at some point after the plaintiff has started his course of negligent conduct that continues right up until the moment he's injured, the defendant has an opportunity to stop the bad thing from happening. Yeah. After the plaintiff started doing the negligent thing. Yes, I would quibble with it a little bit just because under Exum it says that the defendant's negligence can be ongoing. It doesn't have to be a subsequent act. And they specifically disavow that logic. Is this a case about like two vehicles are going towards a wire and honestly neither person is paying enough attention to the fact that there's a wire? Is that the case you're talking about? The Exum case is the, sorry, it's the. I just remember one of the North Carolina cases, a case about two people going along and there's a wire. And like they both should be looking for the wire. And the defendant's argument is the plaintiff should have been looking for the wire. And then the defendant's argument is, but you should have been looking for the wire too. Yeah, that's the Keenan versus Bass case. The Exum case is where there's the man changing the tire on the side of the road in Chapel Hill. And he's got his back towards the traffic behind him. And then the defendant is kind of barreling in and should have seen him changing the tire and did not. And the court said, well, you could have just whipped over to the side. And so your duty is ongoing. Yes, you are negligent. Defendant was negligent and did not see the plaintiff changing the tire. But then continued to be negligent. And the North Carolina law imposes a duty on people, on drivers to have a constant vigilance to the roadway and see that. And so the defendant had a constant duty to see this. I think I understand the argument you're making. So the defendant's action has to be at least occurring, whether it started before or after, at least be occurring at some point after the contributory negligence began. Correct. It's approximate cause analysis. So what we couldn't say here, to go back to the jury's note, is that the last clear chance was in cutting out the bar. Correct. Okay. But the last clear chance in this scenario, as you posited, has to come inside the bin on the day of the incident. I guess it could come just before that when Mr. Pryor opens the doors and he's about to get in and they see him about to get in. So quibbling with it a tiny bit. Yes, it's after that. So just in terms of concretely what could have happened, at some point someone could have said, hey, don't do that. That would be a bad thing for you to do. Or, hey, just keep in mind that when you do that, there's this thing that would be really dangerous to you. Hey, we cut the bar out. Yeah. They could have done this. Could have done lots of things. And they didn't. And that's when they had the last clear chance. There's a lot of time. Mr. Pryor testified he had an entire conversation with Mr. Phillips, one of the managers, inside the grain bin. And nobody said, hey, we cut that bar out. And you can't see it in here. It's very dark. It's very dusty. And even as we submit it, there's an OSHA regulation or whatever interpretation that talks about that. What is the best evidence that someone inside the bin not just knew that he was there but knew that he was in some form of helpless peril? And I'm not trying to distinguish between the two types of thing, but they both involve some sort of peril that he's in that he's not capable in some sense of extricating himself from. What's the best evidence, taking it in the light most favorable to you in those things, that would help show that there's evidence that a jury could conclude that somebody in the bin sort of looked at Mr. Plyler, who's not some newbie, and sort of recognized or should have recognized that he was in helpless peril? That's a good question. I think it's heavily fact-dependent. And Mr. Plyler, his testimony is I went in. I did not know the bars had been cut out. I go in the bin. I have this discussion with Mr. Phillips. And no point during that time. Mr. Phillips admits he has superior knowledge. He knows the bars were cut out. And the jury can believe— What's the evidence that he knew he had superior knowledge? He knew the bars were cut out. But what's the evidence that he had any reason to think that Mr. Plyler did not know that? You're right. You're right. I mean, I totally get it. If he had superior knowledge and knew that, that's one thing. But we don't really have that, right? You're right. And I misspoke in that he has superior knowledge and he knows the bars were cut out. Robby does not. His knowledge is superior. But he doesn't go so far as to say, I knew that Robby did not know, which I think is what you're getting at. And so, well, we do know that many people on the farm were not told the bars were cut out. And so then you look at, did he know, should have known, or have a duty to Mr. Plyler under the case law that we've all submitted? And I think under all of those, he should have known because lots of people on the farm did not know. This was not Mr. Plyler's normal operation. There was no warning whatsoever. There was not training on this farm. So he should have known, the jury could find, or that there was a duty to ensure these things. I think that's a little hard, right? Because you read the trial transcript here to Mr. Plyler's great credit. He was sort of extraordinarily well respected, it seems like, just from the trial record. And so it seems a little odd. I mean, that's both positive for him, but it sort of undercuts this idea that somebody in the bin should have been like, I'll bet that guy has no idea what he's doing here, right? You're right, but I think that's a determination for the jury. That's a credibility determination. Mr. Plyler said, I'm normally on the hog farm. I'm doing maintenance. I'm the maintenance man. I've done grain bin cleanouts, but it is not my normal gig. Whereas everybody else is doing it multiple times a year. And so everybody should know that Mr. Plyler, this is not something he does every day, and you've got to be extra careful. He's not trained on it. He's just, he's in an inferior position because he doesn't do it all the time. And so I think the farm has a duty to make sure that everybody knows you go into the bin, we've cut these bars out. Because that's not part of his normal operation. So I think that, again, that's a question for the jury. And I think the jury was, we know the jury was attuned to this issue. They looked at it. They said, when does it apply? And then Judge Whitney correctly, over no objection, restated the law in North Carolina from the jury instructions or provided to him. I don't actually think he restated it. What do you do with the idea that we know from the question that they were plainly confused about when peril attached? Right? I mean, I think you would agree that two of the three options they give, like if we were doing just pure law, would have been incorrect, right? Like the peril did not attach when they built the grain bin and peril did not attach when the phone call came in. I mean, I don't take you to be arguing that it could have, right, that only one of the three options that were available. But it sort of suggests that they didn't quite grasp what was going on here. I agree with you. I mean, I think that certainly it didn't attach when they built the bins. I think when Mr. Cox, Mr. Rusty Cox, tells Mr. Plyler to go to the bin, that's a maybe, and I'll tell you why. And in all candor, I admit that's tenuous. But then certainly once Mr. Plyler goes into the bin and opens the doors, I think it's very clear. So one, we have to assume the jury got it wrong in saying, well, we've got one of three or maybe two of three, and we're just going to assume they went with installation of the bins and they got it wrong. I don't think that's what you guys would be doing. And then, you know, to get into a little bit more creative argument on the Rusty Plyler, Mr. Plyler, sorry, Mr. Cox phone call to Robbie, if the North Carolina Supreme Court cites this unfettered ass case, and I get it's a weird case from England, but the North Carolina Supreme Court cites it, and in that case you've got a man who fetters his donkey, which ties it up and makes it so it can't escape, on the roadway. And then you've got another man who's coming along the roadway with his horses. And he's behind the horses and he can't really see them. So he's let, in modern day terms, his agents or something like that go ahead of him. And they say last third chance applied because he should have been up there with his horses. And his horses ran over the donkey and hurt the donkey or killed the donkey. And so the last third chance applied when he should have been, his duty was to be with those horses. And had he discharged that duty, he could have had the last third chance. So the jury, it could be that Mr. Cox, he has a duty to ensure the safety inside the grain bin once he's sent somebody there. Once he's sent the horses in front of him, he's got a duty to make sure it's safe going forward. And he didn't. So arguably, but I certainly get that's tenuous and maybe creative. But I don't think we have to say we've got one of three options. One is certainly incorrect. One is maybe. And one is correct. We don't have to sit there and say we went the uncorrect avenue. I think that's for the trial court, for the judge to make that decision. Can you, your colleague on the other side started with the Dahlberg question. Do you want to give a brief response to that? We stand by our brief, but I think Judge Whitney got it right. He's done many, many, many trials. I think he got it right. We stipulated to the expertise of both our experts. They actually didn't call their expert. I noticed they also cite in their brief to this court that these two OSHA provisions don't, regulations don't apply, but yet their own expert, which was submitted to this court in the joint appendix, agreed that those very same regulations did apply. So I think that's kind of bizarre. But I think Judge Whitney, we stipulated to the expertise, and then he says, here's why I have the expertise. I was the president of safety globally or something. I've been in thousands of these things, and here's how I know, and here's the basis, and here's why they apply. I think Judge Whitney absolutely discharged his gatekeeping function when he heard all that evidence and said, yes, you're the, you can, you have the expertise, and this does apply. Just because they now say, in disagreeing with their own expert, that it doesn't apply, that doesn't mean Judge Whitney didn't do his job at all. I think Judge Whitney did a fantastic job on that. We're asking for a moment whether this is adequately preserved. What is your argument for why Rusty and Campbell-Cox could be held liable on a last-clear-chance theory? As I understand it, they weren't present when the injury happened, and they're not general partners of the partnership, and so they're not personally liable for anything that the partnership is liable for. So what is the theory for why they're liable on a last-clear-chance theory? As you pointed out at the beginning of your question, we believe they've waived that argument both twofold. One, it wasn't properly – I didn't hear your argument on that. I've espoused my theory on Mr. Rusty-Cox using the unfettered-ass analogy. I think it would also maybe apply to Campbell-Cox, but it's weak. I'm not going to stand here and tell you it's not. It's weak, and I think had we had that opportunity in trial court, we could have fleshed that out. Or the jury could have said yes, yes, no, no on those. I should know the answer to this, but as a matter of North Carolina law, are all of the defendants jointly and severally liable in the judgment? At this point, yes, yes. And if you don't have any further questions, I'd like to save my remaining time for as they cross appellate for reply. Thank you, counsel. If that's permitted. Thank you. It will be. Mr. Robb, we're happy to hear from you. Am I saying that right? Is it Mr. Robb? It is Robb. Yes, thank you, Judge. Judge Richardson, you asked the question, what is the best evidence that other people in the bin knew that Robbie Plyler was in peril? And the answer to that is there wasn't any. None whatsoever. No evidence from which any reasonable jury could infer that anybody else in the bin was aware that Robbie Plyler had opened the steel doors that covered the sumps, that Robbie Plyler said he didn't know that the bars had been cut out, and that Robbie Plyler was unaware that he had fully opened those steel doors, and that on this occasion, Robbie Plyler, the safest man on the farm, wasn't paying attention to what he was doing or where he was stepping. Your Honor, pointed to the evidence that all the testimony at trial was that Mr. Plyler was a good employee and a safe man. And in fact, that day, according to Mr. Plyler, when Rusty Cox called him, he said, I've got some boys in a grain bin. You're the safest man on the farm. I want you to go up there and keep those boys safe. There's no evidence that anybody in the bin should have surmised that Mr. Plyler was unaware of what he was doing. Now, what do you do when your colleague says, listen, he's a great farmer, all these sorts of things, but this wasn't what he did, right? This was not sort of the primary responsibilities that he had, and the idea of sending him up there to sort of generally supervise is one thing, but nobody would have thought that he was getting in the bin. And so when somebody sees him in the bin, they should have said, hey, you're not usually in the bins, and don't forget, or let me tell you that the bar is missing, and so if you put your foot in the hole, you're not going to have it. Well, Your Honor, even with the evidence in the light most favorable to the plaintiff, the bar was a non-issue. Plaintiff's own expert said removing the bar didn't matter. All that mattered— Yeah, that's not really true. So, all right, go past—that's actually not true, but go past that, right? He says you could put a guard on it instead. Exactly. You could add a guard on top. That's right, but he— Nobody thinks they did that. Well, I disagree, Your Honor. Can you go back to the previous point? I understand you want to make that argument, but do you have an argument, like why that doesn't work other than the bar doesn't matter? Yes, two things, Your Honor. So if Mr. Plyler was unaccustomed to grain bins, a reasonable man would not have walked up to the bin and opened the steel doors all the way without asking how much they were open, without telling anybody in the bin that he was doing it. So you've established contributory negligence. And then when Mr. Plyler— But why is that relevant to the question? That's contributory negligence. I'm asking about the last— Yes, but it relates to when he was helpless, Your Honor, and whether he was inattentive. Then when he climbs in the bin and is not looking where he was going, he's being inattentive. Under the Rule 480 analysis for inattentive plaintiff, the other people in the bin are only charged with acting for Mr. Plyler's safety if they know that he is in peril and have reason to believe that he is unaware of his peril and is not going to act for his own safety. And there was no evidence of that, Your Honor. I see that I'm out of time. Is there anything else you'd like me to address? Thank you, counsel. We will come down and— Ah, sorry. You want to talk more, don't you? I don't have to if you just want to— No, no. I'm happy for you to come back up. We're not used to having to cross appeals, but Judge Hytens helpfully points out that you've got more to say. I do, and, you know, I don't— Procedurally, it's a little unusual, so I don't know if I'm confined to keep my comments now to our cross appeal. I'm not going to cut you off. Okay. Well, I'll just respond briefly to what Mr. Robb just said when I think he stated the law about it's— did the defendants, did the appellants know that Mr. Plyler was unaware the bar turned out? That's not the law. The law in North Carolina from the Exum case that I've highlighted during this argument states, it's clear the court held, let's see, there must be proof that after the plaintiff had, by his own negligence, gotten into a position of helpless peril, parentheses, or into a position of peril to which he was inadvertent, the defendant has discovered the plaintiff's helpless peril or inadvertence or being under a duty to do so should have, and thereafter the defendant having the means and the time to avoid the injury negligently failed to do so. So it's what I said earlier. It's knew, should have known, or had a duty. And there's no question that they had a duty that under OSHA and under the standard of care that we submitted to the jury, they had a duty to ensure the safety of the employees going into the bin of an unguarded auger in conditions such that they were very difficult. Second is they should have known. You had men in there that knew the bar was cut out and they knew that other people didn't know. To quote Mr. Campbell Cox, he says that they didn't need to know. Talking about Mr. Leos and Mr. Gonzalez says they didn't need to know. They're paid to go in and sweep. The men that are most doing that job, the boots on the ground for that job, say that they didn't need to know. It's on a need-to-know basis, and that's unacceptable for an employer when you have an unguarded auger to discharge that duty. And I think that's what the jury found and said you should have known. You should have told those people, and you had a duty. And I think the jury is proper to do that, and the evidence certainly supports, assuming this was all properly before the court, the evidence certainly supports the jury's verdict, and we ask that you affirm the trial court. Thank you, counsel. We will now adjourn court for the day.
judges: Julius N. Richardson, Toby J. Heytens, Henry F. Floyd